United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

WILLIAM B. DENKERS and
GLORY M. DENKERS,

    Defendants.
                                    /

No. C 09-03403 WHA

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND VACATING HEARING**

## INTRODUCTION

In this action brought by the United States to reduce seven years of unpaid federal income taxes to judgment, the government moves for summary judgment against defendants William B. Denkers and Glory M. Denkers. For the reasons explained below, while defendants' tax liability must be reduced to account for a $10,000 payment made to the IRS in 2007, the government's motion for summary judgment must nevertheless be **GRANTED**.

## STATEMENT

Defendants William B. Denkers and Glory M. Denkers filed joint U.S. individual income tax returns for the tax years of 1995, 1996, 1997, 1998, 1999, 2000, and 2001 (Stamm Decl. ¶ 2, Exhs. 3, 8–13). They readily admit, however, that they did not pay the full amount owed for any of these tax years due to a variety of medical ailments and related expenses (G. Denkers Decl. ¶¶ 2–13). The Internal Revenue Service made assessments against defendants pursuant to these

1  seven joint income tax returns. The assessments totaled $183,715.75 as of June 26, 2009 (Stamm
2  Decl. ¶ 2, Exhs. 1–7). This total reflected all unpaid federal income taxes, penalties, and interest
3  as of that date for the seven tax years in question.

4  During these seven years, defendants attempted to reach a compromise with the IRS over
5  their unpaid tax liabilities (G. Denkers Decl. ¶¶ 14–15). In 1997, defendants submitted their first
6  Offer-in-Compromise ("OIC") to the IRS (*id.* at ¶ 15). An OIC is a statutorily authorized
7  mechanism by which a taxpayer with an outstanding tax liability may try to "bargain" with the
8  government over taxes owed. *See* 26 U.S.C. 7121, 7122; *see also* 26 C.F.R. § 301.7122-1. No
9  agreement was reached (*id.* at ¶ 16).

10  In 2002, defendants again attempted to compromise with the IRS using the OIC process
11  (*id.* at ¶¶ 17–22). The 2002 OIC was "returned" to defendants (*id.* at ¶ 24).[1] The reasons
12  provided by the IRS for the returned OIC were that (1) the amount offered would negatively
13  affect defendants' ability to pay other obligations and (2) defendants were not current with
14  estimated tax payments (*id.* at ¶ 26). Defendants attempted to appeal the return of their 2002
15  OIC, but the request was denied (*id.* at ¶¶ 31, 32, 40).

16  In early 2004, defendants filed their third OIC (*id.* at ¶ 54–55). The OIC was promptly
17  returned by the IRS due to the alleged failure of defendant William Denkers to file an
18  unemployment tax return for the period ending December 31, 1998 (*id.* at ¶ 56). Defendants
19  promptly filed a replacement form for the 1998 unemployment tax return, and resubmitted the
20  same OIC (*id.* at ¶¶ 57, 59–61). The OIC was then rejected (*id.* at ¶ 64). Defendants filed a
21  timely administrative appeal (within 30 days of the rejection), which was considered by the IRS
22  (*id.* at ¶¶ 67–69). Around this time, defendants hired a tax attorney (*id.* at ¶ 76). The
23  administrative appeal was eventually denied (*id.* at ¶ 71–80).

---

[1] A "return" is different from a "rejection." An OIC may be returned to a taxpayer, rather than rejected, if the taxpayer has not submitted necessary information, has filed for bankruptcy, has failed to include a required application fee or non-refundable payment with the offer, or has failed to file tax returns or pay current tax liabilities while the offer is under consideration. A returned OIC differs from a rejected OIC because there is no right to administratively appeal the former. *See* 26 C.F.R. § 301.7122-1.

2

1    In 2007, defendants filed yet another OIC (*id.* at ¶ 80). Pursuant to a new rule that had
2 been enacted in 2006, defendants included a $10,000 non-refundable payment with their
3 application (representing 20% of their $50,000 compromise offer) (*id.* at ¶ 85). The OIC, which
4 was submitted by defendants to satisfy their outstanding tax liabilities for tax years 1995 through
5 2001, was returned (*id.* at ¶ 87). The IRS, however, did not return the $10,000 payment (it was
6 non-refundable), but applied it to defendants' 1994 tax liability (*id.* at ¶ 96).

7    Defendants then sought to abate the penalties and interest applied to their outstanding tax
8 liabilities (*id* at ¶¶ 97, 101, 108). They also attempted to subordinate certain federal tax liens that
9 had been imposed by the IRS (*ibid.*). None of these efforts was successful (*id.* at ¶¶ 106, 118).
10 During this process, however, defendants claim that IRS Revenue Officer Donna Diloreto
11 informed them that she had "waived penalties for 1998, 1999, and 2001" (*id.* at ¶ 104).

12   Officer Diloreto was one of many IRS agents who interacted with defendants. Indeed,
13 defendants frequently worked with Revenue Officer Martha Levy in the preparation and
14 submission of their various OICs (*see id*. at ¶¶ 17, 18, 20). Defendants claim that Levy
15 misleadingly told them that (1) they were "ideal candidates" for a specific type of OIC called the
16 "Effective Tax Administration" offer-in-compromise, (2) the IRS would never try to seize and
17 sell their home (which turned out not to be true), and (3) the IRS would make a counteroffer on
18 their 2004 OIC if it was too low (*id.* ¶¶ 18, 30, 45, 64). Additionally, defendants claim that the
19 IRS provided them with wildly inconsistent estimates of their total tax liability during the process
20 outlined above (*id*. at ¶¶ 104, 120, 134).

21   The government does not dispute any of the above facts alleged by defendants.

22                              *          *          *

23   Following this chain of events, on July 24, 2009, the United States filed this action
24 pursuant to 26 U.S.C. 7402(a) to reduce defendants' federal income tax assessments for tax years
25 1995 through 2001 to judgment (Dkt. No. 1).

26                                    **ANALYSIS**

27   Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,
28 and admissions on file, together with the affidavits, show that there is no genuine issue as to any

3

material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In resolving a summary judgment motion, all reasonable inferences must be drawn in the light most favorable to the non-moving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

### 1. BURDEN OF PROOF

"In an action to collect taxes, the government bears the initial burden of proof." *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir. 2004) (citation omitted). This burden is automatically satisfied, however, by the production of "deficiency determinations and assessments for unpaid taxes" by the IRS, which are presumed correct "so long as they are supported by a minimal factual foundation." *Ibid*. If such assessments by the government have been issued and presented in court, the burden shifts to the taxpayer to show, by a preponderance of the evidence, "that a [deficiency] determination is arbitrary, excessive or without foundation." *Ibid*. (citing *Helvering v. Taylor*, 293 U.S. 507, 515-16 (1935)); *Rockwell v. Comm'r*, 512 F.2d 882, 885 (9th Cir. 1975) (setting the evidentiary standard). Only if the taxpayer can meet this burden must the government produce additional proof to substantiate their assessments. *See Keogh v. Comm'r*, 713 F.2d 496, 501 (9th Cir.1983).

At summary judgment, the government — as the moving party — can "rest its case" once deficiency determinations and assessments are produced. *See Palmer v. U.S. I.R.S.*, 116 F.3d 1309, 1312 (9th Cir. 1997). The presentation of a Certificate of Assessments and Payments (also called Form 4340) for each tax year in question is sufficient to meet this evidentiary burden at summary judgment. *Hughes v. United States*, 953 F.2d 531, 535 (9th Cir. 1992); *see also United States v. Scott*, 290 F. Supp. 2d 1201, 1205 (S.D. Cal. 2003).

Here, the United States submitted — as attachments to the declaration of Attorney Blake Stamm — Certificates of Assessments and Payments pursuant to the income tax returns prepared and filed by defendants for tax years 1995, 1996, 1997, 1998, 1999, 2000, and 2001 (Stamm Decl. ¶ 2, Exhs. 1–7). The government also provided the underlying 1040 forms for six of the seven tax

4

years at issue. As such, the government has met its initial burden at summary judgment. Given this showing, to survive summary judgment, defendants bear the burden of producing evidence that *the assessments* were "arbitrary, excessive or without foundation," or that "an affirmative defense bars collection[.]" *Olshan*, 356 F.3d at 1084; *Scott*, 290 F. Supp. 2d at 1205.

Defendants do not deny that they owe back income taxes to the United States government (Opp. 1). They also do not claim that the Certificates of Assessments and Payments are "arbitrary, excessive or without foundation." Indeed, the calculations in the assessments are based upon defendants' own income tax filings! Rather, defendants make the following four claims: (1) the IRS's bad faith and unclean hands during the OIC process preclude granting summary judgment; (2) waiver and estoppel during the OIC process preclude granting summary judgment; (3) the statute of limitations bars recovery of assessments for certain tax years; and (4) the $10,000 payment made in conjunction with the 2007 OIC should be applied against the assessments.

As explained below, only one of these arguments has merit.

### 2. BAD FAITH AND UNCLEAN HANDS

Defendants claim that the IRS, during the OIC process described above, "exhibited many instances of bad faith and/or unclean hands and/or which may constitute conduct which harasses, oppresses or abuses a taxpayer in violation of 26 U.S.C. § 6304(b)" (Br. 8). In arguing these defenses, defendants cite to no authority — binding or persuasive — showing that "bad faith" or "unclean hands" can rebut the presumptive *correctness* of a tax deficiency determination. Indeed, the Court is unaware of any decisions supporting the applicability of such defenses to an action by the IRS to reduce tax assessments to judgment. Nevertheless, even assuming that such defenses could be raised, defendants' undisputed allegations do not support a finding of "bad faith" or "unclean hands."

The OIC process provides taxpayers who owe outstanding taxes with a mechanism to try to settle their debts with the government. By engaging in the process, there is *no guarantee* that an offer will be accepted. Indeed, as set forth in the Code of Federal Regulations, "the decision to accept or reject an offer to compromise, as well as the terms and conditions agreed to, is left to

5

1  the *discretion* of the Secretary [of the Treasury]." 26 C.F.R. § 301.7122-1(c)(1) (emphasis
2  added); *see also* 26 U.S.C. 7121, 7122.  In other words, the federal government is *never required*
3  to accept a taxpayer's offer to compromise.

4  That said, there are specific regulations governing the process by which the IRS must
5  review, return, accept, and/or reject offers-in-compromise.  *See* 26 C.F.R. § 301.7122-1.  Even
6  considering the full scope of these regulations, however, none of the actions taken by the IRS in
7  its dealings with defendants evidences "bad faith" or "unclean hands."  *First*, with respect to
8  defendants' returned OICs (which, as explained in an earlier footnote, are different from OICs
9  that are rejected by the IRS), the regulations clearly state that "[a]n offer to compromise . . . must
10  be submitted according to the procedures, and in the form and manner, prescribed by the
11  Secretary."  Otherwise, the IRS may return the OIC to the taxpayer.  *See* 26 C.F.R. §
12  301.7122-1(d)(1).  Here, the various reasons provided by the IRS for returning defendants' OICs
13  are clearly set forth in the regulations.  *See* 26 C.F.R. § 301.7122-1(d)(2).  Additionally, the
14  regulations are clear in that there is no right to appeal the IRS's determination that an OIC
15  application should be returned to the taxpayer.  26 C.F.R. § 301.7122-1(f)(5)(ii).

16  *Second*, with respect to defendants' rejected OICs, the various grounds for rejection stated
17  by the IRS clearly fall within the scope of the regulations.  *See* 26 C.F.R. § 301.7122-1(b)–(f).
18  For example, the IRS may reject an OIC "if compromise of the liability would undermine
19  compliance by taxpayers with the tax laws" — exactly the reason provided for the rejection of the
20  2002 OIC (G. Denkers Decl. ¶¶ 24–28).  26 C.F.R. § 301.7122-1(b)(3)(iii).

21  *Third*, while it may be true that certain IRS revenue officers — such as Revenue Officer
22  Levy — provided advice and opinions to defendants that ultimately did not lead to the acceptance
23  of any of defendants' OICs by the Secretary, such statements neither evidenced "bad faith" nor
24  bound the federal government in any way.  The law is clear that IRS agents do not have the
25  authority to accept a compromise offer, and taxpayers are not entitled to rely on any oral
26  representations made by such agents.  *See Heckler v. Community Health Svs.*, 467 U.S. 51, 65
27  (1984); *Brooks v. United States*, 833 F.2d. 1136, 1146 (4th Cir. 1987); *Boulez v. Commissioner*,
28  810 F.2d 209, 212–16 (D.C. Cir. 1987).  Indeed, the authority to bind the federal government in a

6

compromise is granted *exclusively* by federal statute to the Secretary of the Treasury. *See* 26 U.S.C. 7121.

In sum, while this order does not doubt that defendants were frustrated with their inability to negotiate a compromise with the IRS on their unpaid income taxes, the simple fact is that they were never *entitled* to a compromise in the first place. While defendants' story illustrates that the IRS may, at times, be disorganized and brusque in carrying out its duties, the government's refusal to accept anything less than the full amount of income taxes owed does not, under defendants' own set of undisputed facts, demonstrate an abuse of discretion, bad faith, or unclean hands.

Moreover, this order emphasizes that no court has ever held that claims of "bad faith" or "unclean hands" can rebut the presumptive *correctness* of a deficiency determination for unpaid taxes. How defendants were treated by the government has nothing to do with whether the IRS's tax assessments have been accurately calculated. Defendants' "bad faith" and "unclean hands" arguments fail.

### 3. WAIVER, ESTOPPEL, AND LACHES

Defendants' arguments of waiver, estoppel, and laches are based upon two separate grounds: (1) Revenue Officer Diloreto's purported statement that she was "waiving penalties" for certain tax years, and (2) allegedly inconsistent estimates of defendants' total tax liability provided by the IRS during the OIC process (Br. 15–16).

With respect to the defense of laches, even assuming defendants' story is completely true, the law is clear that the United States is immune from this equitable defense in the enforcement of tax claims. *See Dial v. Commissioner*, 968 F.2d 898 (9th Cir. 1992) (holding that "laches is not a defense to the United States' enforcement of tax claims"); *see also United States v. Summerlin*, 310 U.S. 414, 416 (1940).

Defendants' estoppel argument similarly fails. Estoppel requires that (1) the party to be estopped knew the facts, (2) the party to be estopped intended that his conduct would be relied upon, (3) the party invoking estoppel was ignorant of the true facts, and (4) the party invoking estoppel detrimentally relied upon the other party's conduct. *United States v. Hemmem*, 51 F.3d

7

883, 892 (9th Cir. 1994). Defendants do not even attempt to show that these elements have been met, or explain how their interaction with the government (which, again, is not disputed) establish this defense. Moreover, when the defense of estoppel is made against the government, a higher burden applies. *See Heckler v. Cmty. Health Servs. of Crawford County*, *Inc.*, 467 U.S. 51, 60 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined."). As such, "estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Ibid.*

Here, even crediting every item of evidence presented by defendants as true, they have failed to meet this burden. Defendants have produced no evidence (and have made no arguments) showing that any of the IRS agents they interacted with knew some set of "true facts" that they (as taxpayers) were not aware of. Additionally, defendants have failed to show that a "serious injustice" would result if they were held liable for paying income taxes that they admit they failed to pay! Indeed, it must be repeatedly emphasized that the assessments filed by the government are based solely upon income tax forms that defendants themselves filed with the IRS, and that defendants' burden is to show that these calculations are "arbitrary, excessive or without foundation." The defense of estoppel must therefore be rejected.

Finally, defendant's waiver argument fails because — as noted above — the authority to bind the government in settlements and compromises of tax disputes lies solely with the Secretary of the Treasury. *See* 26 U.S.C. 7121, 7122. Even assuming that Revenue Officer Diloreto represented to defendants that penalties for certain tax years "had been waived," she had no authority to do this, and her statements would not bind the federal government in this action. *See Wagner v. Director, FEMA*, 847 F.3d 515, 519 (9th Cir. 1988) ("The government could scarcely function if it were bound by its employees' unauthorized representations.") (citation omitted).

In sum, even under defendant's own set of facts, none of these defenses has merit.

8

### 4. STATUTE OF LIMITATIONS

Where the assessment of any tax imposed by the Internal Revenue Code has been made, such tax may be collected by a proceeding in court *only if the proceeding is begun within ten years after the assessment of the tax*. *See* 26 U.S.C. 6502(a)(1). This ten-year period is called the Collection Statute Expiration Date (or "CSED"). Under certain circumstances, however, the CSED may be extended beyond ten years. *See* 26 U.S.C. 6502(a)(2). For example, periods during which the IRS may not levy will toll the CSED period. Relevant to this litigation, periods during which an OIC is pending with the Secretary, and — if an OIC is rejected — a period of 30 days after the rejection of an OIC, will toll the CSED. 26 U.S.C. 6331(k)(1), 6503(a)(1). Additionally, if a timely appeal is filed following an OIC rejection, the appeal period will also toll the CSED. *Ibid.*

Both sides agree that the CSED was tolled for 85 days during the pendency of the 2007 OIC and for 20 days during the pendency of the 2002 OIC (Opp. 21; Reply 8). Where the parties differ, however, is over the tolling period attributable to the multiple OICs filed in 2004. Defendants argue (again without citing to any authority) that a "pattern of bad faith shows that the IRS had no intention of fairly reviewing Defendants' appeal of the 2004 OIC rejection," and therefore the appeal period associated with the 2004 OICs should not be applied to the tolling period (Opp. 19). Excluding the appeal period, defendants assert that the government is time-barred under the CSED from collecting unpaid taxes for tax years 1995, 1996, and 1997. The government — as well as this order — disagrees.

As mentioned in the statement of facts, defendants filed two OICs in 2004 (G. Denkers Decl. ¶¶ 54–55). The first, filed in January 2004, was returned shortly thereafter due to William Denkers' failure to file an unemployment tax return in 1998 (*id.* ¶ 56). After correcting the 1998 tax filing, defendants resubmitted the same OIC (with a new application fee) in late February 2004 (*id.* ¶ 57). In late March 2004, the IRS — for reasons unknown — asked defendants to submit a new OIC form with additional information (*id.* ¶ 59–61). Defendants submitted this form in late March 2004 (*ibid.*).

9

In their opposition brief, defendants argue that the CSED tolling period for the 2004 OICs should be measured based upon the *last* OIC form submitted in March 2004 (Opp. 19). In other words, defendants ask the Court to completely ignore the two earlier OIC forms submitted in January 2004 and February 2004. Defendants cite to no authority to justify this argument, and indeed, the law does *not* allow these earlier OIC submissions to be ignored.

Based upon the facts in defendants' own declaration, they filed an OIC in January 2004. According to the Certificates of Assessments and Payments filed by the IRS, the January OIC became "pending" on January 22, 2004, and remained "pending" until it was returned to defendants 26 days later (Reply Attach. 1; Stamm Decl. Exh. 4). Thus, the CSED was tolled for 26 days due to the January 2004 OIC.

Defendants, by their own admission, then resubmitted the same OIC with a new application fee in late February 2004. This OIC became "pending" on March 3, 2003 (*ibid.*). It is undisputed that this OIC *was never returned to defendants* (*ibid.*). Rather, it remained "pending" until it was rejected, administratively appealed (within the 30 day appeal period), and rejected again on appeal on February 27, 2006 (Stamm Decl. Exh. 4). Under a clear application of the tolling rules and regulations, the CSED was tolled from March 3, 2003, to February 27, 2006, for a total of 726 days. Adding this tolling period to the 26 days associated with the January 2004 OIC, the two OICs filed in 2004 tolled the CSED by a whopping 752 days.

As for defendants' argument that the tolling period for the appeal period should be ignored due to the IRS's "bad faith" during the appeal process, this must be rejected. As discussed earlier in this order, the IRS — while perhaps disorganized and brusque at times — was under no obligation to accept any compromise offers made by defendants, and did not abuse its discretion under the applicable code regulations. There is no evidence to support a finding of "bad faith" during the administrative appeal of the 2004 OIC.[2]

Considering the tolling periods associated with the OICs filed by defendants in 2002 and 2007, the CSED was tolled for a grand total of 857 days. As such, based upon the dates of

---

[2] This order also emphasizes that there is no caselaw — binding or persuasive — supporting defendants' argument of "bad faith" to bar the tolling of the CSED.

10

1  assessment for all the tax years at issue, the government was required to file this action by
2  September 1, 2009, to avoid any statutory bars to collection. *See* 26 U.S.C. 6502(a)(1). This
3  action was timely filed on July 24, 2009 (Dkt. No. 1). As such, the CSED does not bar the United
4  States from collecting any assessments for the tax years in question.

### 5. THE $10,000 VOLUNTARY PAYMENT

Defendants' final argument is that the required $10,000 payment submitted with their 2007 OIC was improperly applied to their 1994 tax liabilities, which the government is not targeting in this litigation. Due to this allegedly improper allocation, defendants assert that the assessments submitted by the government must be reduced by this amount (Opp. 22–24).

Under longstanding IRS policy, when a taxpayer makes a voluntary tax payment, it can direct that the payment be applied to a particular tax liability rather than to another one. *Tull v. United States*, 69 F.3d 394, 396 (9th Cir. 1995); *see also Slodov v. United States*, 436 U.S. 238, 253 n. 15 (1978). If the taxpayer fails to direct the government as to how a particular payment should be applied, however, the law is clear that the payment "may be credited as the IRS desires." *Davis v. United States*, 961 F.2d 867, 879 (9th Cir. 1992) (citation omitted).

Here, defendants' 2007 OIC was clearly designated as applying to defendants' tax liabilities for tax years 1995 through 2001 (*see* Dkt. No. 46, Exh. 2). The $10,000 payment — which, under 26 U.S.C. 7122(c)(2)(A), is considered a voluntary payment on tax — was made in conjunction with the 2007 OIC (*see* G. Denkers Decl. ¶ 96). Indeed, defendants had to include this payment to submit their lump-sum OIC application. Despite the 2007 OIC being specifically directed towards defendants' tax liabilities for tax years 1995 through 2001, however, the IRS applied the $10,000 payment against defendant's 1994 tax liability, which the IRS is now allegedly barred from collecting under the CSED.

This was improper. While there is no question that the IRS may apply *undesignated* voluntary tax payments in a manner "as the IRS desires," the $10,000 payment was clearly associated with an OIC directed *exclusively* towards defendants' tax liabilities for tax years 1995 through 2001. Indeed, defendants clearly marked and wrote on their OIC application: "[w]e . . . submit this offer to compromise the tax liabilities . . . for the tax type and period marked below:

. . . 1040/1120 Income Tax-Year(s) 1995, 1996, 1997, 1998, 1999, 2000, and 2001" (Dkt. No. 46, Exh. 2). This is a sufficiently clear written "designation" such that the IRS should not have applied the $10,000 up-front payment against a tax year beyond the scope of the offer-in-compromise. To rule otherwise would unfairly disregard defendants' clear written intent that their $10,000 payment be applied against the particular tax years targeted by their OIC.

## CONCLUSION

For the reasons set forth above, the government's motion for summary judgment is **GRANTED**. The government, however, shall apply defendants' $10,000 payment associated with their 2007 OIC application against the tax period expressly designated in the application, and reassess defendants' total tax liability to account for this reduction. Once the government submits a revised tax liability assessment, judgment will be entered accordingly.

The hearing on this motion is **VACATED**.

**IT IS SO ORDERED.**

Dated: March 29, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE